Charles CASEY and Jeannette
Casey, Plaintiffs,

v.

GEEK SQUAD® SUBSIDIARY BEST
BUY STORES, L.P., Defendant.

Civil No. PWG–10–2268.

United States District Court,
D. Maryland,
Northern Div.

Nov. 10, 2011.

Sandra B. Minton, Nead Karey and Minton LLP, Robert K. Nead, Nead Minton & Ferris LLP, Baltimore, MD, for Plaintiffs.

Christopher R. Dunn, Decaro Doran Siciliano Gallagher and DeBlasis LLP, Bowie, MD.

### MEMORANDUM AND ORDER

PAUL W. GRIMM, United States Magistrate Judge.

This Memorandum and Order addresses the Motion for Summary Judgment, ECF No. 19, filed by Defendant GEEK Squad® *Subsidiary* Best Buy Stores, L.P. ("Geek Squad"); Plaintiffs Charles Casey and Jeanette Casey's Response to Defendant's Motion for Summary Judgment ("Pls.' S.J. Resp."), ECF No. 21; and Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Def.'s S.J. Reply"), ECF No. 24.[1] It also addresses Defendant's Motion *In Limine* to Exclude Plaintiffs' Expert Witness Dr. Clark Riley, ECF No. 20; Plaintiffs' Re-

---

1. This case was referred to me by Judge Blake for all proceedings on September 28, 2010 with the consent of the parties and pursuant to 28 U.S.C. § 636(c)(1) and Local Rule 301.4.

sponse to Defendant's Motion *In Limine,* ECF No. 22; and Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion *In Limine* to Exclude Plaintiffs' Expert Witness Dr. Clark Riley, ECF No. 23.

I find that a hearing is unnecessary in this case. *See* Loc. R. 105.6. For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED. Defendant's Motion *In Limine* to Exclude Plaintiffs' Expert Witness Dr. Clark Riley also is GRANTED. This Memorandum and Order therefore disposes of ECF Nos. 19, 20, 21, 22, 23, and 24.

## I. BACKGROUND

In reviewing the evidence related to a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant. *Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); *George & Co., LLC v. Imagination Entm't Ltd.,* 575 F.3d 383, 391–92 (4th Cir.2009); *Dean v. Martinez,* 336 F.Supp.2d 477, 480 (D.Md.2004). Unless otherwise stated, the background provided below is comprised of undisputed facts. Where a dispute exists, however, the facts are considered in the light most favorable to Plaintiffs.

On or about September 8, 2007, Mr. Casey brought his personal computer to Defendant Best Buy Stores, L.P.'s Timonium, Maryland store for servicing by Geek Squad technicians.[2] Compl. ¶ 5, ECF No. 1; Defs.' Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s S.J. Mem.") 1, ECF No. 19–1. A Geek Squad technician diagnosed Mr. Casey's computer with a computer virus, Pls.' S.J. Resp. 1–2, and took the computer for servicing, *id.* at 2. While doing so, Geek Squad technicians removed the computer virus, installed an operating system, cleaned out temporary files, and defragmented and scanned the disk. *Id.* Technicians also disassembled and inspected Mr. Casey's computer. *Id.;* Service Order 1, Pls.' S.J. Resp. Ex. G, ECF No. 21–7. Mr. Casey was informed that his computer was available for pickup on October 22, 2007, but when he arrived, Geek Squad technicians informed Mr. Casey that, after servicing, the computer's hardware components no longer fit inside the computer tower. Def.'s S.J. Mem. 2; Pls.' S.J. Resp. 2–3. Replacement of the CD drive was necessary so that all hardware components would fit into the tower. Pls.' S.J. Resp. 3. Later that day, after waiting for the drive to be installed, Mr. Casey brought the computer home, returned it to the computer desk where it was stored prior to servicing, connected the cables, and began working on the computer. *See* Def.'s S.J. Mem 2; Pls.' S.J. Resp. 3. Between September 11, 2007, when the computer was brought to the Geek Squad for servicing, and October 22, 2007, when the Plaintiff returned home with the computer, no changes were made to the area around the computer desk where the computer was located. Compl. ¶ 12. In that same time period, "no changes were made to the electrical system within Plaintiff's home," and no electrical surges were reported within Plaintiff's home. *Id.* ¶¶ 13–14.

Approximately two hours later, Mr. Casey attempted to print a document from the computer. *See* Def.'s S.J. Mem. 2.

---

2. As employees of Defendant, the Geek Squad technicians who serviced Mr. Casey's computer were acting as Defendant's agents, and as a result, any negligence by the technicians would be imputed to Defendant. *See Schramm v. Foster,* 341 F.Supp.2d 536, 543 (D.Md.2004) ("Under the doctrine of *respondeat superior,* an employer is vicariously liable for the tortious conduct of his employee or agent when that employee or agent is acting within the scope of [their employment].") . In servicing and repairing Mr. Casey's computer, Geek Squad technicians were undoubtedly acting within the scope of their employment relationship with Defendant.

Upon receiving an error message, he realized that the computer tower was not connected to the printer. *Id.* Then, stabilizing the front of the computer with his left hand, Mr. Casey reached around the back of the computer with his right hand to locate the printer cable. Pls.' S.J. Resp. 3. While Mr. Casey was reaching behind the computer tower, he received a severe electric shock, causing significant injuries. *Id.*; Compl. ¶¶ 15–23. There is some disagreement between Plaintiffs and Defendant about Mr. Casey's actions while reaching behind the computer. Defendant states that Mr. Casey "was shocked only after attempting to plug the printer into the back of the computer tower." Def.'s S.J. Mem 6. Plaintiffs state that Mr. Casey "had nothing in his hand and had not touched the printer or its cable at the time of the electrical shock. His hand was behind the computer tower—not on the printer or the printer cable."[3] Pls.' S.J. Resp. 13.

Plaintiffs filed a three-count complaint in federal court on August 19, 2010. Compl. 7–9. First, Mr. Casey alleged negligence and/or negligent omission, claiming that Defendant "had a duty to repair the Plaintiff's identified computer in such a manner as to restore the computer to its pre-repair condition ... and without danger to the Plaintiff"; that Defendant breached its duty by negligently repairing the computer and failing to restore it to its pre-servicing condition; that, but for Defendant's negligence, Mr. Casey would not have been shocked; and that, as a result of Defendant's conduct, "Plaintiff sustained extensive injuries and mental anguish and further experienced significant damages and losses." Compl. ¶ 32. Mr. Casey also denied any contributory negligence. *Id.* ¶ 33. Second, Mr. Casey alleged "breach of warranty of fitness for use," claiming that Defendant "holds itself out as a provider of service to consumers relating to computer repairs and maintenance"; that Mr. Casey "had a reasonable expectation that the computer returned to him would be in working condition"; and that Defendant "breached its warranty when it returned a defective computer to Plaintiff" that caused injury. *Id.* ¶ 35. Finally, Plaintiffs Mr. and Mrs. Casey alleged loss of consortium, claiming that "[a]s a result of Defendant's negligence, for more than a year Charles Casey was no longer able to perform any duties around the home, or to provide for his own care, or to share activities with his wife of over fifty years." *Id.* ¶ 38. In light of these three claims, Plaintiffs' Complaint requested compensatory damages, costs, fees, interest, and any other appropriate relief. *Id.* at 9.

Several months later, Defendant filed two motions—a Motion for Summary Judgment and a Motion *In Limine* to exclude the testimony of Plaintiffs' expert, Dr. Clark Riley. Dr. Riley's testimony is essential to the merits of Plaintiffs' case because it seeks to establish causation; therefore, it is appropriate to consider Defendant's Motion *In Limine* first.

## II. DEFENDANT'S MOTION *IN LIMINE*

### A. Standard of Review

■ Under Fed.R.Evid. 104(a), the Court is tasked with determining "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibili-

---

**3.** For purposes of the present motion, the Court accepts Plaintiffs' version of these events. *See Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (explaining that, on summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion") (internal quotation marks and citation omitted).

ty of evidence," including the admissibility of expert testimony under Fed.R.Evid. 702. Rule 702 permits expert testimony "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir.1999) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Additionally, the rule requires that an expert's opinions be based on sufficient facts and reliable methodology that has been applied reliably to the facts of the case. Fed.R.Evid. 702(1)-(3). Simply put, the Court must review expert testimony to "ensur[e] that [it] both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *see also Samuel v. Ford Motor Co.,* 96 F.Supp.2d 491, 493 (D.Md.2000) ("[F]ederal trial courts are required, pursuant to Rule 104(a) ... to screen scientific or technical evidence before it may be considered by the jury, to insure that it is both reliable, and relevant. Otherwise, it is not 'helpful' as required by Rule 702."). "The party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence." *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.,* 767 F.Supp.2d 549, 553 (D.Md.2011). Except for the rules related to privilege, the Rules of Evidence are not strictly applied in the Court's Rule 104(a) determination. *See* Fed.R.Evid. 104(a).

█ In reviewing the reliability of an expert's testimony, the Court must ask "whether [the expert's opinion] is supported by adequate validation to render it trustworthy." *Westberry,* 178 F.3d at 260.

In conducting this review, "the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." *Id.* at 261 (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150–51, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). As noted, Rule 702 provides three factors for the Court to consider: " '(1) [whether] the testimony is based upon sufficient facts or data, (2) [whether] the testimony is the product of reliable principles and methods, and (3) [whether] the witness has applied the principles and methods reliably to the facts of the case.' " *United States v. Willock,* 696 F.Supp.2d 536, 562 (D.Md.2010) (alteration in original) (quoting Fed.R.Evid. 702).

█ In its capacity as a "gatekeeper" of expert evidence, the Court must exclude expert testimony that is based only "on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999). An expert's proffered testimony is inadmissible "when it is based on assumptions which are speculative and are not supported by the record." *Tyger Const. Co. v. Pensacola Const. Co.,* 29 F.3d 137, 142 (4th Cir. 1994); *see also Bryte ex rel. Bryte v. Am. Household, Inc.,* 429 F.3d 469, 477 (4th Cir.2005) (noting that the reliability requirement in "*Daubert* aims to prevent speculation"). Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." [4] *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

---

**4.** *Ipse dixit* is translated as "[h]e himself said it," and defined as "a bare assertion resting on the authority of an individual." *Black's Law Dictionary* 961 (4th ed. 1951); *see also* *Webster's Collegiate Dictionary* 639 (9th ed. 1984) ("[A]n assertion made but not proved.").

Accordingly, the Court's wide discretion in reviewing expert testimony "includes the discretion to find that there is 'simply too great an analytical gap between the data and the opinion proffered'" by the expert. *Pugh v. Louisville Ladder, Inc.*, 361 Fed. Appx. 448, 454 n. 4 (4th Cir.2010) (quoting *Joiner*, 522 U.S. at 146, 118 S.Ct. 512).

In addition to reliability, the Court also must consider the relevance of the expert's proffered testimony. *Id.* If the expert's testimony "does not relate to any issue in the case[, it] is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. To be relevant, the expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.; see also Westberry*, 178 F.3d at 260 (noting that the Court must analyze "whether the [expert's] opinion is relevant to the facts at issue"). This relevance requirement "has been aptly described ... as one of 'fit.'" *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

■ As *Daubert* explained, a Court assessing whether an expert's scientific, specialized, or technical testimony satisfies the requirements of reliability and relevance should consider five non-exclusive factors: (1) "whether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) the extent to which the theory or technique has achieved "'general acceptance'" in the "relevant scientific community." *Id.* at 593–94, 113 S.Ct. 2786 (citation omitted); *see also Kumho*, 526 U.S. at 141, 119 S.Ct. 1167 (*"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."); *Md. Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 784–85 (4th Cir.1998) (finding that the *Daubert* factors were not meant to be exclusively or rigidly applied). The inquiry is a "flexible" one, "focus[ed] ... on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786.

In reviewing the reliability and relevance of an expert's testimony, the Court "should also be mindful of other applicable rules." *Id.* at 595, 113 S.Ct. 2786. Rule 403 advises that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Because the jury will often have "difficulty ... evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). Accordingly, expert testimony that is more likely "to mislead [the trier of fact] than to enlighten should be excluded" under Rule 403. *See id.*

**B. Summary of Arguments**

Defendant seeks to exclude the testimony of Plaintiffs' expert witness, Dr. Clark Riley,[5] whose investigation and report concluded, among other things, that the injury sustained by Mr. Casey "was caused by an intervening act of the Defendant." Def.'s Mot. *In Limine* ¶ 2 (citation and internal quotation marks omitted). Defendant argues that "Dr. Riley's opinions are not founded upon any reliable basis of method-

---

5. A review of Dr. Riley's deposition reveals that he holds a doctorate degree in chemistry, and that his testimony was refreshingly candid and straightforward. However, as Dr. Riley himself acknowledges, his advanced degree was not directly relevant to the issues he was asked to investigate. *See* Riley Dep. 14:18–22, 15:1–7.

ology or reasoning as required by Federal Rule of Evidence 702 and, therefore, should be excluded from trial in this matter."[6] *Id.* ¶ 4. Specifically, Defendant alleges that Dr. Riley's investigation and testimony, which concludes that, because no other source of Mr. Casey's injury is apparent, the actions of Geek Squad must have led to Mr. Casey's injury, "invites this … Court to 'take his word for it' and make the same assumptions that he has in finding that, for some reason, Defendant herein is liable." *See* Def.'s Mem. Supp. Def.'s Mot. *In Limine* 11. Defendant also argues that Dr. Riley's opinions "are not relevant as required by" Rule 702 and are likely to confuse or mislead the jury, requiring their exclusion under Rule 403. Def.'s Mot. *In Limine* ¶ 5. Dr. Riley's opinions are irrelevant, Defendant argues, because his training and expertise are in fields not relevant to this case: Dr. Riley is a "certified computer technician," not an electrical engineer, and his certification applies to Apple computers. Def.'s Mem. 12. The computer at issue in this case is a PC. *Id.* Defendant suggests that this distinction is significant because, without a background in electrical engineering, Dr. Riley is unable to assist the trier of fact in understanding how Mr. Casey's computer generated the electrical shock that caused his injury. *See id.* at 10–11. Moreover, Dr. Riley testified that "he was unable to locate any 'direct evidence of what caused the grounding failure,' … and that he could not find any physical signs of damage or errors on the part of Defendant's technicians." *Id.* (citation and internal quotation marks omitted). Accordingly, Defendant insists, Dr. Riley's testimony is "irrelevant as those issues do not require further determination." *Id.* Lastly, Dr. Riley's opinions, Defendant argues, are likely to confuse or mislead the jury: "If Dr. Riley is permitted to testify as to his assumptions, as though they were 'evidence,' the jury will potentially be distracted from the pertinent issues of the case." *Id.* at 13.

Plaintiffs respond that Dr. Riley's opinions are reliable, arguing that Dr. Riley's inspection was limited by "the absence of any documentation concerning what work the Geek Squad may have performed and the disassembling of the subject computer by Defendant's own expert prior to Dr. Riley's review, necessitating some reliance on Defendant's experts." Pls.' Resp. to Def.'s Mot. 6. The fact that Dr. Riley's opinion is "based on the lack of any evidence to allow for any other cause" does not, Plaintiffs argued, imply that his conclusions are unreliable. *See id.* Rather, "Dr. Riley poses a hypothesis, and checks it against all other possibilities. Finding none, the hypothesis holds." *Id.* Plaintiffs also explain that Dr. Riley's testimony is relevant because it explains "how a[n] electrical charge is generated," a fact that "would be important for the trier of fact to understand." *Id.* at 7. In response to Defendant's claim that Dr. Riley's testimony is prejudicial under Rule 403, Plaintiffs note: "[i]t is true that the opinions would allow a jury to infer Defendant's negligence, but that in itself is not prejudicial." *Id.* at 8.

In its Reply, Defendant argues that Dr. Riley's deposition testimony does not support Plaintiff's assertion that "Dr. Riley

---

**6.** Defendant characterizes Dr. Riley's inspection as follows: "[H]is reasoning and methodology, if any, which led to his admitted 'assumption' that Plaintiff Charles Casey's injuries were due to the actions of Defendant, consisted of a visual inspection of the computer (that yielded nothing), for less than a half-hour, outside of Plaintiff's home, after it had been previously disassembled, without any electrical equipment or tools beyond a magnifying glass, while the computer was not hooked up to a power source." Def.'s Mem. Supp. Def.'s Mot. *In Limine* 10–11.

pose[d] a hypothesis, and check[ed] it against all other possibilities." Def.'s Reply 2. In fact, Defendant states: "Dr. Riley did not testify to any of the foregoing with regard to his reasoning and methodology." *Id.* Moreover, Defendant contends, the conclusion that Dr. Riley reviewed all other possible causes of Mr. Casey's injury "is difficult to reach considering, for example, that Dr. Riley did not even visit the office where the computer was located and, therefore, could not rule out the possibility, however remote, of an environmental cause." *Id.* at 2–3. As to relevance, Defendant argues that Plaintiffs inaccurately characterize the relevance of Dr. Riley's testimony as assisting the jury in understanding " 'how a computer could render an electric shock.' " *Id.* at 3 (citing Pls.' Opp'n to Def.'s Mot. at 7). Rather, Defendant insists, because "Dr. Riley could not state what caused the subject computer to emit a shock," his opinion "hardly seems to be the opinion of an expert that is relevant for the purpose" of aiding the jury in understanding how the electric shock that injured Mr. Casey was generated. *Id.* at 3–4. Moreover, Dr. Riley "readily admits that he is not an electrical engineer and, indeed, did not attempt to recreate the shock during his examination [of the computer] because he did not feel qualified to do so." *Id.* at 4. As a result, Defendant contends, Dr. Riley's conclusions "have 'a greater potential to mislead than to enlighten' " and should be excluded. *Id.* (citation omitted).

## C. Discussion

▆ The crux of Defendant's argument for exclusion of Plaintiffs' expert witness is that Dr. Riley's opinion is neither reliable nor relevant as required by Fed.R.Evid.

702, and that his testimony is unfairly prejudicial and should be excluded under Fed.R.Evid. 403.[7] Def.'s Mot. *In Limine* ¶¶ 4–5. In his expert report, Dr. Riley concludes that "the electric shock sustained by [Mr.] Casey was caused by an intervening act of the Geek Squad. . . . But for the work completed by the Geek Squad, [Mr.] Casey, would not have sustained an injury." Def.'s Mot. *In Limine* Ex. C, Riley Letter 2–3 ("Riley Letter"), ECF No. 20–4. Plaintiffs fail to establish how Dr. Riley's conclusions are based on "reliable principles and methods . . . reliably applied to the facts of [this] case," as Rule 702 requires. Fed.R.Evid. 702 Advisory Committee Note. I find that Plaintiffs have failed to meet the reliability requirements of Rule 702 and that, if Dr. Riley was permitted to express the opinions stated in his deposition, their probative value would be substantially outweighed by the danger of unfair prejudice, and potentially misleading, under Rule 403. Therefore, I do not address the issue of relevance.

A review of Dr. Riley's proposed testimony under the three-part rubric outlined in Rule 702 makes plain that Dr. Riley's testimony is not "supported by adequate validation to render it trustworthy." *Westberry*, 178 F.3d at 260. First, Dr. Riley's testimony is not "based upon sufficient facts or data." Fed.R.Evid. 702. Dr. Riley's report states that his opinions are based on the following: one conversation with Mr. Casey, one inspection of Mr. Casey's computer, and review of various records, including the records provided to Mr. Casey by Defendant after servicing his computer, Mr. Casey's deposition, Mr. Casey's interrogatory answers, Defendant's interrogatory answers, and a review

7. Neither party has requested a *Daubert* hearing on this issue. *See Muovich v. Raleigh Cnty. Bd. of Educ.*, 58 Fed.Appx. 584, 589 (4th Cir.2003) ("The court is not required to hold a *Daubert* hearing if neither party requests one."); *see also* Loc. R. 105.6. ("Unless otherwise ordered by the Court, . . . all motions shall be decided on the memoranda without a hearing.").

of the report prepared by Defendant's expert, without photographs included. Riley Letter 1. The term "data" in Rule 702 "is intended to encompass the reliable opinions of other experts." Fed.R.Evid. 702 Advisory Committee Note. Thus, the report of Defendant's expert, insofar as it is deemed reliable, could be "sufficient data" on which Dr. Riley may base his conclusions. Fed.R.Evid. 702. Problematically, however, the report prepared by Defendant's expert, Christoph Flaherty, P.E., has not been included in the record in this case, and the Court is therefore unable to review its reliability. Dr. Riley's report fails to point to any specific facts or data provided in Mr. Flaherty's deposition, which *is* included in the record, Pls.' S.J. Resp. Ex. K, ECF No. 21–11, that formed a basis for Dr. Riley's conclusion that the electrical shock that injured Mr. Casey was caused by Defendant's negligence. Thus, although an expert's opinion may be based on "the reliable opinions of other experts," Mr. Flaherty's opinions do not represent "sufficient data" on which Dr. Riley may base his conclusion. Indeed, Dr. Riley noted in his deposition that, neither he nor Mr. Flaherty found any damage to the Casey computer itself. *See* Def.'s Mot. *In Limine* Ex. B, Riley Dep. 37:20–21 ("Riley Dep.") ("There was nothing in his report and that's all I have to go on."). Nonetheless, Dr. Riley purports to have been able to conclude, without reference to other specific facts or data gleaned from Mr. Flaherty's investigation, that Defendant's actions were the cause of Mr. Casey's injuries. The phrase "facts or data" in Rule 702 is also intended to "allow an expert to rely on hypothetical facts that are supported by the evidence." Fed.

R.Evid. 702 Advisory Committee Note. However, Dr. Riley did not respond to any properly framed and factually sufficient hypothetical questions in his deposition testimony or report. Rather, as described later, Dr. Riley made a variety of unsupported assumptions.

Second, Dr. Riley's testimony is not "the product of reliable principles and methods." Fed.R.Evid. 702. Indeed, Dr. Riley noted in his deposition, that his methodology for inspecting Mr. Casey's computer involved a visual examination of the computer without "any testing at all." Riley Dep. 25:17–22; 26:1–7.[8] Dr. Riley did not use a multimeter to check voltage or current surrounding the computer and he did not examine the computer's power cord. *Id.* at 26:8–18. Instead, Dr. Riley inspected the Casey computer by running his "hand along the cords looking for abrasions [and] frayed ends," "check[ing] the individual connections to make sure that they were, in fact, plugged into the right places on the computer," and "check[ing] for any places where there were sharp bends … that might have indicated that [the cords] had been caught in the case." *Id.* at 35:15–22, 36:1–6. Dr. Riley "use[d] a magnifying glass when [he did] find rough spots," but did not locate "any place where the casing of the wires had been breached." *Id.* at 36:7–9. Dr. Riley's examination did not occur while the computer was plugged in, nor did he attempt to plug in or turn on the computer. *See id.* at 38:10–22, 39:1–9. In fact, Dr. Riley's investigation of the Casey computer occurred outside of Plaintiffs' home, away from the location where Mr. Casey received the electric shock. *Id.* at 20:7–11.

---

**8.** Dr. Riley described his visual inspection of Mr. Casey's computer as follows: "I opened [the computer] up, I examined all the different parts, I looked for frayed wires, I looked for misconnections, I looked for screws that had not been replaced, I look to see if the

replacement drive had any sort of a jury-rigged connection or anything else like that, and I did not find anything, anything amiss when I examined it." Riley Dep. 25:18–22, 26:1–2.

Dr. Riley also did not attempt to reproduce the shock, noting that such an investigation would be "an electrical engineering problem." *Id.* at 29:6–13. Thus, Dr. Riley's deposition testimony and report do not establish that his investigation of Mr. Casey's computer was performed pursuant to a reliable methodology, "theory[,] or technique." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Without any reference in the record to a recognizably reliable methodology employed in his investigation, and in light of the evidence showing that Dr. Riley conducted a visual examination of the computer away from the site of the original shock, using no tools other than a magnifying glass and his hands, while the computer was turned off and not plugged in to an electrical source, this Court is unable to find that Dr. Riley's conclusions meet the reliability requirement of Rule 702.[9]

In their Response to Defendant's Motion *In Limine,* Plaintiffs attempt to define Dr. Riley's methodology as follows:

> As a computer expert, Dr. Riley makes his decision based on the lack of any evidence to allow for any other cause,

the control of the Casey computer by Defendant for 40 days, an electrical charge created by Plaintiff's physical contact with the computer, [and] the lack of any other theoretical cause. Dr. Riley poses a hypothesis, and checks it against all other possibilities. Finding none, the hypothesis holds.... [T]his is a common, tested and acceptable methodology for proving a "theory."

Pls.' Resp. to Def.'s Mot. *In Limine* 6. Plaintiffs' description of Dr. Riley's methodology is without citation to the record, case law, relevant literature in the field of computer maintenance and repairs, or relevant safety standards, if any. Plaintiffs also fail to show that the methodology used by Dr. Riley satisfies any of *Daubert's* non-exclusive factors—or any other possible criteria. The *Daubert* factors are particularly relevant when considering whether an expert's testimony satisfies the methodology requirement in Rule 702. Accordingly, a brief review of their applicability is helpful.

Dr. Riley's hypothesis—that the actions of Defendant resulted in the electric shock that caused Mr. Casey's injuries—is

---

**9.** The Fourth Circuit "permits not only scientific expert testimony but also 'experiential expert testimony.'" *Touchcon, Inc. v. Berreskin & Parr,* No. 1:07cv114 (JCC), 2010 WL 4393282, at *3 (E.D.Va. Oct. 29, 2010) (quoting *United States v. Wilson,* 484 F.3d 267, 274 (4th Cir.2007)). Experiential testimony need not "rely on anything like the scientific method." *Wilson,* 484 F.3d at 274. Instead, for experiential testimony to be reliable under Rule 702, the expert must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts" of the case. *Id.* Unfortunately, Dr. Riley's proffered testimony does not satisfy even this more lenient test. Neither Dr. Riley's report nor his deposition testimony explains how he arrived at his conclusions, why his expertise and experience provide "a sufficient basis" for his conclusion, or how he "reliably applied" his experience to

the facts of this case. Indeed, Dr. Riley noted that he had no experience with similar instances of computers generating electric shocks of the kind that injured Mr. Casey. *See* Riley Dep. 34:3–19 (noting that, in forty-two years of "computer work," he has not seen "a computer shock a person to the degree it did to [Mr.] Casey"). Moreover, Dr. Riley's expertise is "[i]n the field of computer work," *id.* at 48:7, and his experience centers on "setup, installation, software upgrade, the broad spectrum of computer maintenance," *id.* at 14:11–12. Nowhere does Dr. Riley indicate how this experience provided "a sufficient basis" for his conclusion "[t]hat the electric shock sustained by [Mr.] Casey was caused by" Defendant. *Wilson,* 484 F.3d at 274; Riley Letter 2. Similarly, Dr. Riley fails to describe how he "reliably applied" his experience in computer maintenance in reaching his conclusion about the shock.

"unique to [the facts of] this case." *Fireman's Fund,* 767 F.Supp.2d at 554. Accordingly, "the Court would not expect it to be published or peer reviewed, or to have a known error rate," and therefore those *Daubert* factors are inapplicable here. *Id.; see also Kumho,* 526 U.S. at 151, 119 S.Ct. 1167 (noting that it should "not be surprising in a particular case" if some of the *Daubert* factors are inapplicable). At least one other *Daubert* factor remains applicable here: "whether [Dr. Riley's] theory or technique ... can be (and has been) tested." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Testing is "a key component of the *Daubert* inquiry, and the failure to properly test a hypothesis is often grounds for excluding expert testimony." *Fireman's Fund,* 767 F.Supp.2d at 554. In addition, the expert must be able to "rule out alternative hypotheses." *Id.* at 555 (citing *Higginbotham v. KCS Int'l,* 85 Fed.Appx. 911, 916 (4th Cir.2004)). In so doing, the expert "must demonstrate not only that his hypothesis is plausible, but that *it,* and not some alternative hypothesis best explains the event in question." *Id.* Dr. Riley fails to make this showing. For the reasons explained above, Dr. Riley's "testing" of the Casey computer—by offsite visual examination, without tools, and while the computer was off and unplugged—was an insufficient method for testing his hypothesis that Defendant's actions caused the electric shock that injured Mr. Casey. Additionally, Dr. Riley failed to "rule out alternative hypotheses" for what may have caused the electric shock. For example, Dr. Riley noted that he did "not know directly from any tests" whether "the [attached] power cord contributed to the cause of the shocking." Riley Dep. 26:19–22. Dr. Riley also admitted that while it "would have been ... important" to "test the interior wall outlets" in Mr. Casey's home to determine if they were properly grounded, he did not do so. *See id.* at 42:10–14 (noting that if the outlets were "not grounded, that would be a problem"). Finally, Dr. Riley acknowledged that "if there was something grossly wrong with the printer," it might generate an electric shock. *Id.* at 44:10–11; *see also id.* at 43:19–20 ("Q. Could the printer have caused the shock? A.... I don't know.") He did not, however, examine or inspect the printer. *Id.* at 44:19–20, 43:17–18. Dr. Riley failed to examine meaningfully other possible causes of the electric shock that injured Mr. Casey, such as the printer, the power cord, and the grounding of the outlets in Mr. Casey's home. As a result, he is unable to "rule out alternative hypotheses" regarding the cause of Mr. Casey's injury, and his testimony should be excluded under Rule 702.[10] *See Fireman's Fund,* 767 F.Supp.2d at 555.

Moreover, the Court must exclude Dr. Riley's testimony as unreliable because it "is based on assumptions that are speculative and are not supported by the record." *Smith v. Virginia Commonwealth University,* 84 F.3d 672, 687 n. 7 (4th Cir.1996); *see also Oglesby,* 190 F.3d at 250; Fed. R.Evid. 702 Advisory Committee Note ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not

---

**10.** The final two *Daubert* factors, "the existence and maintenance of standards controlling the technique's operation," and the extent to which the theory or technique has achieve "general acceptance" in the "relevant scientific community," cannot be evaluated in the present case. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. Because Dr. Riley fails to articulate a precise technique or theory employed in his investigation of the Casey computer or considered in reaching his conclusion, the Court is unable to evaluate whether standards existed that controlled operation of that technique or whether that theory or technique has achieved general acceptance.

speculative before it can be admitted."). Throughout his deposition, Dr. Riley reported that many of his opinions were based on assumptions. *See, e.g.*, Riley Dep. 21:22, 22:1–6 (upon questioning about the conclusion in his report that Mr. Casey's "work environment is dry," Dr. Riley responded: "I guess I made the assumption that it was dry."); *id.* at 32:18–20 ("Q. You're aware of no specific facts to support that? A. Nothing's documented. We don't know who [made the repairs], we don't know what their training was[;] we don't know anything."). Indeed, Dr. Riley's ultimate conclusion—that Defendant's actions were the cause of Mr. Casey's injuries—so far as the Court can tell, is grounded in the following assumption, which is unsupported by any other evidence in the record: Because Mr. Casey had not been shocked by the computer previously, and because the electric shock occurred only after Defendant retained possession of the computer for servicing, Defendant's actions must have caused the computer to generate an electrical shock, causing injury to Mr. Casey.[11] Finally, it is unsurprising that there is so little substance to Dr. Riley's proposed testimony, given that the total time spent in reaching his conclusions was approximately forty-five minutes, consisting of twenty minutes of internet research, and a twenty-five minute examination of the computer. *See* Riley Dep. 7:22, 8:1–21.

Similarly, the Court may exclude expert testimony "that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146, 118 S.Ct. 512. Dr. Riley identifies no facts or theory generally accepted by experts qualified to express conclusions regarding the causes of electrical shock by a personal computer to support his conclusion. All that he advances is his own assertion that he believes his conclusion to be correct "within a reasonable degree of certainty within the field of computer engineering, maintenance[,] and practice"—a field that is far broader than Dr. Riley's own qualifications as a "certified computer technician." Def.'s Mem. 12; Riley Letter 2; Riley Dep. 48:7–19. Put simply, there is "too great an analytical gap" between the facts presented and Dr. Riley's opinion. *See id.* at 146.

■ Finally, given the conclusory, speculative, and unsupported nature of Dr. Riley's proposed testimony and the fact that expert testimony has "the potential to 'be both powerful and quite misleading,'" particularly as to technical or scientific matters, Dr. Riley's testimony also should be excluded under Fed.R.Evid. 403. *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786); *see also Sam-*

---

**11.** Dr. Riley's deposition testimony is telling on this point:

Q. You then say that there was some intervening event that caused the electrical shock. But I think we can agree you don't know what that intervening cause was.
A. Correct. It was—it was working in his home when—when he took it to take it in. And when he got back, that's when he got the shock.
Q. You then said the electrical shock sustained by [Mr.] Casey was caused by an intervening act of the [Defendant]. Give me your basis for that.
A. The basis is that it was working when he took it there. And except for what they did, nothing was different than when he took it in. And while it was in their possession, it was disassembled, a part changed, and reassembled.
Q. Okay, but you—
A. So that's the only thing that had happened that changed the computer from when he had it and had set it up in his home.
Q. But you can't say what was done?
A. No. No, nobody can.
Q. So you're just assuming that because they had it for a while and that they worked on it, that it must have been something they did?
A. Yes. Yeah.
Riley Dep. 31:9–22, 32:1–11.

*uel v. Ford Motor Co.,* 112 F.Supp.2d 460, 470 (2000) (noting that "conjectural opinion testimony should be excluded under Rule 403 because whatever minimal probative value it may be said to possess clearly is substantially outweighed by the danger of confusion"); *United States v. Davis,* 602 F.Supp.2d 658, 684 (D.Md.2009) ("The Court is mindful that 'expert testimony may be assigned talismanic significance in the eyes of lay jurors and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.'" (quoting *United States v. Frazier,* 387 F.3d 1244, 1263 (11th Cir.2004))); *cf. Fireman's Fund Ins. Co.,* 767 F.Supp.2d at 553 (noting that Rule 702 "employs a flexible standard, the aim of which is to prevent the fact-finder from being unduly swayed by opinions, presented as expert judgments, that in fact amount to no more than informed speculation."). Defendant's Motion *In Limine* is hereby GRANTED and Dr. Riley's testimony as to causation is excluded.[12]

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is only proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Meson v. GATX Tech. Servs. Corp.,* 507 F.3d 803, 806 (4th Cir.2007) (citing Fed.R.Civ.P. 56(c)). The moving party bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir.1987). The Court considers the evidence in the light most favorable to the non-movant. *Ricci,* 129 S.Ct. at 2677; *George & Co., LLC,* 575 F.3d at 391–92; *Dean,* 336 F.Supp.2d at 480.

If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. The existence of only a "scintilla of evidence" is insufficient to defeat a motion for summary judgment. Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find in favor of the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To satisfy this burden, the non-movant "must produce competent evidence on each

---

12. Some of Dr. Riley's testimony may be admissible for the limited purpose of assisting the jury in understanding the nature of the computer repair services provided by Defendant. *See* Riley Dep. 48:7–10 ("[I am offered as an expert in this case i]n the field of computer work, in the type of work that the Geek Squad does. For instance, I am a senior field engineer in that I go out and I fix hardware and software on the computers."); *see also* Fed.R.Evid. 702 Advisory Committee Note ("[I]t might be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."). Accordingly, Dr. Riley's testimony is excluded only to the extent that it addresses matters unrelated to the nature of the repair services provided by Defendant and seeks to establish that Defendant's actions caused Mr. Casey's injuries. *See* Fed.R.Evid. 702 Advisory Committee Note ("For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."). However, because I am granting Defendant's Motion for Summary Judgment, the fact that Dr. Riley is qualified to express opinions on matters other than causation does not change the outcome of this case.

element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F.Supp.2d 669, 671 (D.Md.1999). Although "a court must draw all reasonable inferences in favor of the non-moving party when ruling on a summary judgment motion, that party may not create a genuine issue of material fact through mere speculation, or building one inference upon another." *Id.* (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Runnebaum v. NationsBank*, 123 F.3d 156, 163 (4th Cir.1997); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817–18 (4th Cir.1995).

Moreover, to be entitled to consideration on summary judgment, the evidence supporting the facts set forth by the parties must be such as would be admissible in evidence. *See* Fed.R.Civ.P. 56(c); *see Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir.1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial."). When expert testimony is necessary to prove an essential element of Plaintiff's claim—as here, where Plaintiff relies on expert testimony to establish an inference of causation, Pls.' S.J. Resp. 13— "issues regarding the admissibility of the expert's testimony, and its ultimate effect on whether the plaintiff succeeds in meeting his or her burden of proof[ ] can become intertwined." *Samuel,* 112 F.Supp.2d at 467–68. Determining whether an expert's testimony is necessary for a party to satisfy its burden of proof or production can be a complicated matter. *Id.* at 467 n. 6; *see S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 689 A.2d 1301, 1312 (Md.Ct.Spec.App.1997) ("Some questions of causation might involve ... knowledge so recondite that expert testimony would always be required. Other questions of causation would not. There can be no hard and fast rule controlling all

cases."). A helpful rule-of-thumb, particularly in personal injury actions is as follows: "If the trier of fact could not reasonably infer a fact essential to a party's charge, claim, or defense without favorable expert testimony, the party will fail to meet its burden of production if it fails to produce adequate expert testimony." 5 Lynn McLain, *Maryland Practice: Maryland Evidence, State and Federal* § 300.7 (1987).

**B. Summary of Arguments**

Defendant moves for summary judgment, arguing that Plaintiffs did not establish a prima facie case for negligence. Def.'s S.J. Mem. 5–8. Accordingly, Defendant argues, Mrs. Casey's loss of consortium claim, which is derivative of Mr. Casey's negligence claim, also must fail. *Id.* at 13–14. Defendant also contends that Mr. Casey failed to establish a prima facie case for breach of warranty. *Id.* at 12–13. Lacking in both Plaintiffs' negligence and breach of warranty claims, Defendant insists, is evidence of causation, among other things. *Id.* at 12–14. Defendant also states, for example, that "Plaintiffs ... have offered no evidence [as] to the breach of any duty owed by Defendant in performing repairs upon the subject computer." *Id.* at 5. In the alternative, Defendant argues that Mr. Casey's negligence claim is barred by contributory negligence. *Id.* at 14–15. In their Response to Defendant's Motion for Summary Judgment, Plaintiffs argue that Defendant's negligence may be inferred "and that the Defendant's inferred negligence was the cause of [Plaintiff's] injuries." Pls.' S.J. Resp. 11. Moreover, Plaintiffs maintain, "[t]here is no intervening cause between Defendant's control of the computer and the electrical charge experienced by the Plaintiff." *Id.* (citing *Peterson v. Underwood*, 258 Md. 9, 264 A.2d 851 (1970), to show that Maryland "provides for an inference or presumption both of negligence

and of proximate causation").[13] Plaintiffs also allege that the doctrine of *res ipsa loquitur* applies to the present case. *Id.* at 9–11. In its reply, Defendant asserts that Plaintiffs fail "to provide some genuine dispute as to a material fact on the issue of causation," and instead only "provide inferences and conjecture." *Id.* at 5. Defendant notes, in particular, "the lack of any expert testimony . . . to connect an alleged breach to the injuries sustained." *Id.*

## C. Discussion

Preliminary, it must be noted that, because this case is a diversity action in federal court, Compl. ¶ 4, the Court must apply Maryland substantive law to the merits of the case. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, in determining whether Plaintiffs have presented sufficient evidence to withstand Defendant's Motion for Summary Judgment under Fed.R.Civ.P. 56(c), Plaintiffs' negligence, loss of consortium, and breach of warranty claims will be considered under the applicable standards of Maryland substantive law.

## 1. Negligence

■ In their first cause of action, Plaintiffs allege negligence. Under Maryland law, "[t]o establish a cause of action in negligence[,] a plaintiff must prove the existence of four elements: a duty owed to him . . ., a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*,

307 Md. 527, 515 A.2d 756, 758 (1986); *see Moore v. Myers*, 161 Md.App. 349, 868 A.2d 954, 962 (Md.Ct.Spec.App.2005) ("To prevail in a typical negligence action, one must show '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' ") (quoting *Horridge v. Saint Mary's Cnty. Dep't of Soc. Servs.*, 382 Md. 170, 854 A.2d 1232, 1238 (2004)). Plaintiffs present their negligence claim as follows:

> Defendant Geek Squad had a duty to repair the Plaintiff's identified computer in such a manner as to restore the computer to its pre-repair condition, as agreed and as warranted, and without danger to the Plaintiff. The Geek Squad breached its duty when it negligently repaired the identified computer and/or otherwise failed to properly restore the computer to its pre-repair working condition. At no time before leaving the computer with the Geek Squad did the Caseys experience any electrical charges or related injuries. But for the action or inaction of the Geek Squad, Charles Casey would not have experienced any electrical shock. As the result of this negligence or negligent omission, Plaintiff sustained extensive injuries and mental anguish and further experienced significant damages and losses.

Compl. ¶¶ 32–33. Causation poses a significant problem for Plaintiffs' negligence case.[14] Perhaps in acknowledgement of

**13.** In *Peterson*, the Court stated: "When the claimed negligent act and the injury are in close physical or temporal conjunction, absent a different explanation, common experience permits an inference of a cause-effect relationship." 264 A.2d at 855. The *Peterson* Court noted, also, that while "this type of evidence is not inherently insufficient," Plain-

tiff must nonetheless establish "that it amount to a reasonable likelihood or probability rather than a possibility." *Id.*

**14.** Defendant does not challenge two elements of Plaintiffs' negligence claim: the existence of a duty and damages. *See* Def.'s S.J. Mem. 12; Def.'s S.J. Reply 1–2. Defendant

this fact, Plaintiffs, in their Response to Defendant's Motion for Summary Judgment, also assert that the doctrine of *res ipsa loquitur* is applicable. Pls.' S.J. Resp. 9–11. As described below, Plaintiffs are unsuccessful in their attempts to invoke *res ipsa loquitur* and to establish causation. Although Dr. Riley's expert testimony is excluded in light of the grant of Defendant's Motion *In Limine*, it is worth noting that even if Dr. Riley's testimony were admissible, Plaintiffs would nonetheless fail to establish causation.

### i. *Causation*

To establish "causation in the face of a summary judgment challenge, evidence which amounts to a probability, not just a possibility, must be identified by the non-moving party, to guard against 'raw speculation' by the fact finder." *Miskin*, 107 F.Supp.2d at 671–72; *see Sakaria v. TWA*, 8 F.3d 164, 172–73 (4th Cir.1993) ("In a long line of decisions in this circuit we have emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility.' Where, as here, resolution of the causation issue is dependent upon expert opinion, it must meet [the] [standard of probability]."); *Peterson*, 264 A.2d at 855 ("[T]he plaintiff produces legally sufficient proof to get to the jury [by circumstantial, rather than direct evidence] once he shows it is more probable than not that defendant's act caused his injury.").

 Under Maryland law, to satisfy the causation element of their negligence claim, Plaintiffs must show that Defendant's negligence was "both a cause in fact of the injury and a legally cognizable cause." *Young v. United States*, 667 F.Supp.2d 554, 561 (D.Md.2009) (citing

*Pittway Corp. v. Collins*, 409 Md. 218, 973 A.2d 771, 786 (2009)). The "cause in fact" inquiry "concerns whether defendant's negligent conduct actually produced an injury." *Id.* Maryland courts consider two tests in determining whether causation-in-fact exists: the "but for" test and the substantial factor test. *Id.* at 562. The "but for" test considers whether the injury "would not have occurred absent defendant's negligent conduct." *Id.* The substantial factor test applies in situations where more than one independent negligent act may be responsible for a plaintiff's injury. *See id.* Under the substantial factor test, an action is viewed as the cause of an injury only if the action was a "'substantial factor' in bringing about plaintiff's injury." *Id.*

The "legal causation" inquiry is "'a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established.'" *Id.* at 561 (quoting *Pittway Corp.*, 973 A.2d at 786). Commonly, this inquiry "involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Pittway Corp.*, 973 A.2d at 788; *see also Henley v. Prince George's Cnty.*, 305 Md. 320, 503 A.2d 1333, 1340 (1986) ("In applying the test of foreseeability [or, legal causation] ... it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where ... it appears 'highly extraordinary' that the negligent conduct should have brought about the harm.").

---

does, however, assert that it did not breach any duty owed to Plaintiffs and that Plaintiffs fail to establish causation. *See* Def.'s S.J. Mem. 5–12. Because causation poses the most significant problem for Plaintiffs, and

because I conclude that Plaintiffs have not established causation (and therefore, fail to establish a prima facie case for negligence), I do not address the breach of duty element.

Defendant argues that Plaintiffs have failed to establish, either independently or with the testimony of their expert, Dr. Clark Riley, that "any services pertaining to the subject computer's software [performed by Defendant] (i.e., removing malicious programs and/or 'viruses'), or installing the new CD drive," were the cause in fact or the legal cause of Mr. Casey's injuries. Def.'s S.J. Mem. 9. Plaintiffs, citing the record only once and providing no citations to legal authority, respond that "there is an *inference* that Defendant['s] technicians were negligent in their service of the Casey computer and that the Defendant's inferred negligence was the cause of Defendant's injuries." *See* Pls.' S.J. Resp. 11. Additionally, Plaintiffs argue, without citation to the record, that "the technicians knew that whatever had been done incorrectly or improperly inside the computer *could* result in some danger to whoever used the computer in the future—foreseeable harm could result—as the computer had not been put together properly." *Id.* Finally, Plaintiffs argue that the (now excluded) testimony of Dr. Riley helps to establish the necessary "causal relationship between Defendant's negligent repairs and the injury sustained by Plaintiff." *Id.* at 13.

To be considered on a motion for summary judgment, the evidence supporting the facts, as stated by the parties, must be admissible in evidence. Fed.R.Civ.P. 56(c); *Mitchell*, 12 F.3d at 1315–16. For the reasons stated above, Dr. Riley's causation-related testimony is inadmissible. Accordingly, it may not be considered in reviewing Defendant's Motion for Summary Judgment. Without Dr. Riley's testimony, Plaintiffs present no evidence beyond mere speculation that Defendant's actions were either "a cause in fact of [Mr. Casey's] injury" or "a legally cognizable cause." *Young*, 667 F.Supp.2d at 561; *see also Coleman v. United States*, 369 Fed. Appx. 459, 461 (4th Cir.2010) ("The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment."). Therefore, Plaintiffs fail to establish a prima facie case for negligence, and Defendant's Motion for Summary Judgment will be granted. *Coleman*, 369 Fed.Appx. at 461 ("When the nonmoving party fails to establish the existence of an element essential to that party's case, 'there can be no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal citation omitted)). However, even if the Court were to find that Dr. Riley's testimony is admissible, Defendant's Motion for Summary Judgment would be granted, as Dr. Riley's testimony fails to adequately establish the causation element of Plaintiffs' negligence claim. *See* 5 McLain, *supra*, § 300.7 ("If the trier of fact could not reasonably infer a fact essential to a party's charge, claim, or defense without favorable expert testimony, the party will fail to meet its burden of production if it fails to produce *adequate* expert testimony." (emphasis added)).

As a threshold matter, Dr. Riley's testimony does not present evidence that "amounts to a probability, not just a possibility" that Defendant's actions were the cause of Mr. Casey's injury, as is necessary for Plaintiffs to survive a motion for summary judgment. *See Miskin*, 107 F.Supp.2d at 671–72; *see also Peterson*, 264 A.2d at 855. For example, when questioned about whether Mr. Casey's computer was properly grounded at the time of the electric shock, Dr. Riley responded, "I will not say that it was not properly grounded, I don't know; I can't say that it was properly grounded or not either. I

don't know one way or the other." [15] Riley Dep. 38:10–14. Similarly, when asked whether he knew "the cause of the [computer] malfunction" resulting in the electric shock, Dr. Riley responded, "Not directly, no." *Id.* at 27:22, 28:1. On further questioning, Dr. Riley stated that while he "indirectly" knew that the malfunction was caused by "a pathway of current between the computer and [Mr.] Casey," he did not know what caused the "pathway of current." *Id.* at 28:1–9. Moreover, Dr. Riley stated in his report: "A central question is what might have happened to the computer while in the possession of Geek Squad that could have caused the computer to lose its grounding. Pinning down the specific cause of this malfunction is challenging because of the lack of documentation of the repair effort itself and the fact that it has been opened for inspection by third parties since the incident." Riley Letter 2. Nonetheless, Dr. Riley concluded that Defendant's actions caused Mr. Casey's injuries. *See id.* at 2–3. These examples highlight a common theme in Dr. Riley's testimony—namely, a general lack of concrete evidentiary support for his conclusion regarding causation. The evidence presented by Dr. Riley regarding the causation issue cannot be said to establish a probability that his conclusion is correct; at the very most, it suggests that it is *possible* that Defendant's actions caused Mr. Casey's injury. Accordingly, any evidence of causation presented by Dr. Riley is insufficient to withstand Defendant's Motion for Summary Judgment.

Moreover, Dr. Riley's testimony fails to establish that Defendant's actions were either "a cause in fact of [Mr. Casey's] injury" or "a legally cognizable cause."

*Young,* 667 F.Supp.2d at 561. Regarding causation in fact, Dr. Riley presents no evidence that Mr. Casey's injury "would not have occurred absent [D]efendant's negligent conduct." *Id.* at 562. As support for his assertion that "[b]ut for the work completed by the Geek Squad, Dr. Casey would not have sustained an injury," Dr. Riley offers the following:

> As the appropriate documentation for actions relating to the repair of the computer is not available, it can be assumed that the unidentified worker(s) did not want to acknowledge his or their own actions or they were insufficiently trained in making repairs. The obvious action—disassembly, as noted on the repair receipts—was not appropriate for a virus.

Riley Letter 2–3. The fact that disassembly was not appropriate for a virus, without more, does not suggest that Defendant's actions led to the electric shock that injured Mr. Casey. *See* Riley Dep. 29:22, 30:1 ("Q. [Y]ou can't pinpoint anything to say that [the computer] was put together incorrectly [by Defendant's technicians]. A. Not directly, no."); *cf. id.* at 49:1–3 (noting that Dr. Riley is unaware of "any viruses that can cause a [computer] to emit shocks"). Similarly, the fact that Defendant's technicians failed to keep more extensive documentation of their repairs—in Dr. Riley's opinion because Defendant's technicians were "insufficiently trained" and did not want to "acknowledge" their actions—does not, without more, adequately support Dr. Riley's conclusion that but for the actions of Defendant, Mr. Casey would not be injured. Riley Letter 3.

---

**15.** Later, and contradictorily, Dr. Riley reported, "[t]here's not direct evidence of what caused the grounding failure[,] . . . [but] no matter who's responsible for it, it was a grounding failure." Riley Dep. 38:10–14. Even assuming Dr. Riley could definitively conclude that the shock was caused by a grounding failure, his testimony does not affirmatively link Defendant's actions in repairing the computer to the grounding failure, and thereby, to the electric shock it generated.

Plaintiffs argue that Defendant's actions must have caused Mr. Casey's injury because "[t]here is no intervening cause between Defendant's control of the computer and the electrical charge experienced by" Mr. Casey. *See* Pls.' S.J. Resp. 12. Plaintiffs misunderstand the legal significance of intervening cause. Under Maryland law, a negligent defendant may be "relieved from liability by intervening negligent acts or omissions" where the intervening act or omission "is considered a superseding cause of the harm to the plaintiff[ ]." *Pittway Corp.*, 973 A.2d at 788–89. A "superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Id.* (quoting *McGowans v. Howard*, 234 Md. 134, 197 A.2d 915, 918 (1964)); *see also Sindler v. Litman*, 166 Md.App. 90, 887 A.2d 97, 115 (Md.Ct.Spec.App.2005) ("The chain of causation may be broken by an intervening force (negligent or non-negligent) that may, in turn, become a superseding cause, in which case the original tortfeasor's liability will terminate."). Thus, an intervening cause analysis presupposes a negligent defendant. Where, as here, the negligence of the defendant has not been established, an analysis of intervening cause (or the lack thereof) is not necessary. To establish causation, Plaintiffs must show more than the lack of an intervening cause. Having failed to make this showing, Plaintiffs have not established causation in fact under Maryland law.

The legal causation inquiry is reached only " 'after cause-in-fact has been established.' " *Young*, 667 F.Supp.2d at 561 (quoting *Pittway Corp.*, 973 A.2d at 786). Because causation in fact has not been established, I need not reach the legal causation inquiry. As to Plaintiffs' negligence claims, Defendant's Motion for Summary Judgment is GRANTED, as Plaintiffs fail to establish a prima facie case for

negligence—either with or without the testimony of Dr. Riley.

#### ii. *Res ipsa loquitur*

Plaintiffs assert that the doctrine of *res ipsa loquitur* establishes Defendant's negligence in this case, thus entitling Plaintiffs to "present [their] case to a jury based on circumstantial evidence." *See* Pls.' S.J. Resp. 9–11. Under Maryland law, the doctrine of *res ipsa loquitur* permits a jury to infer negligence and causation "on the part of a defendant from a showing of facts surrounding the happening of the injury, unaided by expert testimony, even though those facts do not show the mechanism of the injury or the precise manner in which the defendant was negligent." *Meda v. Brown*, 318 Md. 418, 569 A.2d 202, 205 (1990); *see Peterson*, 264 A.2d at 856 ("*Res ipsa loquitur* situations permit an inference or presumption both of negligence and of proximate causation."). To successfully employ the doctrine of *res ipsa loquitur*, a plaintiff must establish the existence of the following three facts: (1) "An injury of the type which usually does not occur in the absence of negligence; (2) caused by an instrumentality within the exclusive control of the defendant; and (3) which was not a result of an act or omission by the plaintiff." *Koch v. Sports Health Home Care Corp.*, No. 94–1346, 1995 WL 290409, at *7 (4th Cir. May 15, 1995) (citing *Chesapeake & Potomac Tel. Co. v. Hicks*, 25 Md.App. 503, 337 A.2d 744, 752 (Md.Ct. Spec.App.1975)).

If Plaintiffs prove each of these three elements, then *res ipsa loquitur* may apply, with one exception. Where "the plaintiff offers direct proof of negligence" at trial, *res ipsa loquitur* is inapplicable. *McCartney v. Wild World Holding, Inc.*, No. 95–2167, 1996 WL 226105, at *3 (4th Cir. May 6, 1996); *see Dover Elevator*

*Co. v. Swann,* 334 Md. 231, 638 A.2d 762, 765 (1994) ("A plaintiff's reliance on *res ipsa loquitur* is generally necessitated . . . by the fact that direct evidence of negligence is either lacking or solely in the hands of the defendant," and therefore a plaintiff's "attempt to establish specific grounds of alleged negligence [at trial] precludes recourse to [and jury instruction on] the doctrine of *res ipsa loquitur.*") (quoting *Smith v. Bernfeld,* 226 Md. 400, 174 A.2d 53, 57 (1961)). Importantly, however, *res ipsa* "is not a rule of pleading." *Joffre v. Canada Dry Ginger Ale, Inc.,* 222 Md. 1, 158 A.2d 631, 634 (1960); *see* Richard J. Gilbert & Paul T. Gilbert, *Maryland Tort Law Handbook* 158 n. 12 (2d ed. 1992) ("[T]he doctrine of *res ipsa loquitur* is not a rule of pleading; having pleaded specific acts of negligence does not prevent the plaintiff from relying on *res ipsa.*" (citation omitted)). Put simply, "whether a party will be precluded from relying on the doctrine of *res ipsa loquitur* turns upon the evidence produced by the party and whether that evidence satisfies the three essential components of *res ipsa loquitur;* whether specific allegations of negligence have been pleaded is of no moment." *Holzhauer v. Saks & Co.,* 346 Md. 328, 697 A.2d 89, 92 (1997). Therefore, at the summary judgment stage, to benefit from use of the *res ipsa loquitur* doctrine, Plaintiffs must meet the three elements described above, and the pleading of allegations of negligence does not bar them from invoking the doctrine.

 Application of *res ipsa loquitur* to the present case is problematic for several reasons. First, Plaintiffs fail to point to admissible facts in the record demonstrating that the "instrumentality" that caused Mr. Casey's injuries was "within the exclusive control of the defendant." *Koch,* 1995 WL 290409, at *7. As the Maryland Court of Appeals has explained, "[t]he element of control has an important bearing as [negating] the hy-

pothesis of an intervening cause beyond the defendant's control, and also as tending to show affirmatively that the cause was one within the power of the defendant to prevent by the exercise of care." *Holzhauer,* 697 A.2d at 92–93. Accordingly, *res ipsa* does not apply where "the opportunity for interference by others weakens the probability that the injury is attributable to the defendant's act or omission." *Id.* at 93. To use *res ipsa,* Plaintiffs must "demonstrate control sufficiently exclusive to support a reasonable, nonspeculative conclusion by the factfinder that the defendant's negligence—and not that of a third party—was the cause of the accident." *Byrd v. Wal–Mart Stores, Inc.,* No. 98–2261, 2000 WL 20576, at *3 (4th Cir. Jan. 13, 2000) (citing *Holzhauer,* 697 A.2d at 93; *Joffre,* 158 A.2d at 636).

Plaintiffs make no such showing. Indeed, at the time Mr. Casey received the electric shock, the computer was in Mr. Casey's—not Defendant's—exclusive control. *See* Pls.' S.J. Resp. 3 ("Once back home, Plaintiff[ ] placed the computer in the same spot as it had occupied before being taken to Best Buy for repair."); Compl. ¶ 11 ("After picking up the supposedly repaired computer on October 22, 2007, Plaintiff returned to his home [with the computer]."); Def.'s S.J. Mem. 2 ("Plaintiff brought the computer home, connected the various cables, and worked on the computer."). Moreover, while the record is not clear on this point, Mr. Casey, prior to returning home with the computer, would have had to load the computer into his vehicle, and transport the computer from Defendant's store in Timonium, Maryland to Plaintiffs' home in Cockeysville, Maryland. *See* Compl. ¶ 5. During this period of time, in which the computer was picked up at and transported from Defendant's store to Plaintiffs' home, returned to its location in Plaintiffs' home, and used by Mr. Casey in his home

for several hours, the computer cannot be said to have been in the "exclusive control" of Defendant so that the factfinder could draw a "reasonable, nonspeculative conclusion" that Defendant's negligence caused Mr. Casey's injury or that "the cause [of the injury] was one within the power of the defendant to prevent." *Holzhauer*, 697 A.2d at 93. While Plaintiffs are correct that they need not "exclude every possible cause for [the] injury," Pls.' S.J. Resp. 10, they have failed to produce any "sufficient evidence tending to eliminate other causes, such as the absence of negligence, negligence of third parties, or the plaintiff's own alteration or misuse," *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md.App. 41, 549 A.2d 385, 389 (Md.Ct.Spec.App.1988). The mere assertion that "[n]o other cause of Plaintiff[s'] injuries has been presented," Pls.' S.J. Resp. 10, is not enough.

Second, even were Plaintiffs able to establish the three necessary elements of the doctrine, Maryland case law states that "application of *res ipsa loquitur* is not appropriate in a case which uses expert testimony to resolve complex issues of fact." *Dover Elevator Co.*, 638 A.2d at 774; *see Orkin v. Holy Cross Hosp. of Silver Spring, Inc.*, 318 Md. 429, 569 A.2d 207, 208–09 (1990) ("In the strictest sense, *res ipsa loquitur* is limited to those instances where, certain criteria having been met, the trier of fact may draw an inference of negligence from the facts alone.... Resolution of the issues of negligence and causation involved in a [complex] case ... necessarily requires knowledge of complicated matters.... Complex issues of the type generated by a case of this kind should not be resolved by laymen without expert assistance. *Res ipsa loquitur* does not apply under these circumstances."); *Giant Food, Inc. v. Booker*, 152 Md.App. 166, 831 A.2d 481, 493 (Md.Ct. Spec.App.2003) ("The *res ipsa loquitur* doctrine, however, is inapplicable in situations where an expert is needed to prove causation."). In the present case, the production of an electrical shock by a personal computer "is not so simple a[n occurrence] ... that the average layperson's understanding and knowledge permit proceeding on a *res ipsa* theory, without expert testimony." *See Moser v. Agway Petroleum Corp.*, No. 94–2581, 1995 WL 541708, at *3 (4th Cir. Sept. 13, 1995); *see also Dover Elevator Co.*, 638 A.2d at 774 ("This is not simply a case of a barrel falling from the defendant's window onto some hapless pedestrian's head. As a result, the application of *res ipsa loquitur* [is] not appropriate."). Indeed, as Defendant correctly noted, "the facts and circumstances of this case ... require 'expert testimony to resolve complex issue[s] of fact' related to computer services, functionality, repair, program[ ]ing and/or electrical conduction/engineering." Def.'s S.J. Mem. 7 n. 3. Expert testimony—addressing, for example, how an electrical shock, such as the shock that caused injury to Mr. Casey, was generated and conducted—is necessary to a meaningful resolution of the issues in this case. The more technical issues in this case, including those significant issues related to electrical conduction and computer technology, are beyond the knowledge of the average juror and, as such, "should not be resolved by laymen without expert assistance." *Orkin*, 569 A.2d at 209.

In fact, Plaintiffs seek to satisfy one element of *res ipsa* using expert testimony. To show that the injury sustained by Mr. Casey is "of the type which usually does not occur in the absence of negligence," *Koch*, 1995 WL 290409, at *7, Plaintiffs note that their "computer expert," Dr. Riley, has testified that: (1) "a properly grounded computer is designed to prevent electric shocks"; (2) "there was a pathway of current between the computer" and Mr. Casey that did not exist be-

fore the computer was taken for repair; and (3) in his forty "years of computer experience, [Dr. Riley] has not seen a computer shock such as sustained by" Mr. Casey. Pls.' S.J. Resp. 10 (citation and internal quotation marks omitted). Despite Plaintiffs' acknowledgement that "[i]n order to present a claim based on circumstantial evidence (*res ipsa loquitur*)[,] a plaintiff cannot rely on an expert to support an inference of negligence and thus Plaintiff[s] ... would not rely on Dr. Riley to provide any such evidence to establish causation under a res ipsa loquitur claim," Pls.' S.J. Resp. 12, their Response to Defendant's Motion for Summary Judgment relies exclusively on Dr. Riley's testimony to establish one element of *res ipsa loquitur*: the existence of an injury that would not occur without negligence. *See id.* at 10.

For the reasons stated above, *res ipsa loquitur* is inapplicable in this case. As described above, Plaintiffs are also unable to "produce competent evidence on each element of [their negligence] claim"—either with or without the testimony of Dr. Riley—and thereby fail to satisfy Fed. R.Civ.P. 56(c). *Miskin*, 107 F.Supp.2d at 671. Accordingly, Defendant's Motion for Summary Judgment is GRANTED with regards to Plaintiffs' negligence claims.[16]

### 2. Loss of Consortium

Second, Plaintiffs' Complaint alleged loss of consortium, stating that "[a]s a result of Defendant's negligence, for more than a year Charles Casey was no longer able to perform any duties around the home, or to provide for his own care, or to share activities with his wife of over fifty years." Compl. ¶ 38. As a result of Mr. Casey's injuries, "Jeanette Casey was caused to endure and experience additional and extreme stress to her already compromised health and well-being. She became the care taker rather than the one being cared for." *Id.*

Under Maryland law, loss of consortium "claim[s] can only be asserted in a joint action for injury to the marital relationship ... tried at the same time as the individual action of the physically injured spouse." *Owens–Illinois, Inc. v. Cook*, 386 Md. 468, 872 A.2d 969, 980 (2005). Loss of consortium claims "arise[ ] from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Connors*, 339 Md. 24, 660 A.2d 423, 428 (1995). Thus, loss of consortium claims acknowledge "an interdependence between the injury to the marital unit and the action of the defendant that causes that injury." *Cook*, 872 A.2d at 980 (citing *Deems v. W.Md. Ry.*, 247 Md. 95, 231 A.2d 514, 522 (1967)). As a result, such claims are " 'derivative of the injured spouse's claim for personal injury.' " *Id.* at 981 (quoting *Oaks*, 660 A.2d at 430); *see also Klein v. Sears, Roebuck & Co.*, 92 Md.App. 477, 608 A.2d 1276, 1284 (Md.Ct.Spec.App.1992) ("When a physical injury results to a married person as a result of someone else's conduct, two injuries may arise: (1) the physical injury to the spouse who was directly injured by the tortious conduct

---

16. Under Maryland law, "contributory negligence on the part of a plaintiff completely bars recovery against a negligent defendant." *Wooldridge v. Price*, 184 Md.App. 451, 966 A.2d 955, 961 (Md.Ct.Spec.App.2009); *see also May v. Giant Food, Inc.*, 122 Md.App. 364, 712 A.2d 166 (Md.Ct.Spec.App.1998). Because I conclude that Plaintiffs fail to establish a prima facie case for negligence, and that, as a result, summary judgment in favor of the Defendant is appropriate, I need not reach Defendant's alternative (and substantially weaker) argument that summary judgment should be granted in its favor because Plaintiffs' claims are barred by Mr. Casey's contributory negligence.

and (2) the derivative loss of society, affection, assistance, and conjugal fellowship to [the] spouse."). Simply, the loss of consortium claim "is inextricably tied to the underlying personal injury claim." *John Crane, Inc. v. Puller*, 169 Md.App. 1, 899 A.2d 879, 928 (Md.Ct.Spec.App.2006).

"Any tort causing physical injury to one spouse may give rise to a loss of consortium claim by both" spouses. Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 410 (4th ed. 2008) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 932 (5th ed. 1984)). Accordingly, were Plaintiffs able to establish a prima facie case for Defendant's negligence, their loss of consortium claim might also be meritorious. Because summary judgment has been granted in favor of Defendant on Plaintiffs' negligence claim, it must also be GRANTED in favor of Defendant on Plaintiffs' loss of consortium claim.

### 3. Breach of Warranty

■ In their final cause of action, Plaintiffs alleged that Defendant breached the "warranty of fitness for use." Compl. ¶¶ 34–36. Plaintiffs' describe their warranty claim as follows:

> The Geek Squad holds itself out as a provider of service to consumers relating to computer repairs and maintenance. In doing so, the Geek Squad assures, guarantees or promises that its services will provide a working computer. Plaintiff had a reasonable expectation that the computer returned to him would be in working condition. The Geek Squad breached its warranty when it returned a defective computer to Plaintiff, such defect causing Plaintiff to experience an electric shock to his whole body. As a result of Geek Squad's breach, Plaintiff sustained extensive injuries.

*Id.* ¶ 35. The precise nature of Plaintiffs' warranty claim is unclear. Maryland statutory law recognizes claims for breach of express and implied warranties. *See* Md. Code Ann., Com. Law § 2–313 (providing for express warranties by affirmation, promise, description, and sample); *id.* § 2–314 (providing for an implied warranty of merchantability); *id.* § 2–315 (providing for an implied warranty of fitness for a particular use). Plaintiffs have not alleged that Defendant made an express warranty to Mr. Casey. Plaintiffs' ambiguous "breach of warranty of fitness for use" cause of action is likely intended as an action for breach of the implied warranty of fitness for a particular purpose. An implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of the contracting has reason to know a particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Md.Code Ann., Com. Law § 2–315. The implied warranty of fitness for a particular purpose applies only in the sale of goods context. Sandler & Archibald, supra, at 94. The record does not suggest that Mr. Casey and Defendant entered into a sales contract. Plaintiffs might suggest that the parties entered into a hybrid contract, involving "sales of both services and goods" because, at the time that his computer was returned to him, Mr. Casey also purchased a CD drive from Defendant. Pls.' S.J. Resp. 2–3; *P/T Ltd. II v. Friendly Mobile Manor, Inc.*, 79 Md.App. 227, 556 A.2d 694, 698 (Md.Ct.Spec.App.1989). In addressing such hybrid contracts, Maryland courts "have generally followed the predominant purpose test adopted by a majority of jurisdictions: whether a hybrid contract is to be classified as a sale of services or as a sale of goods ... depends on the predominant purpose of the contract." *P/T Ltd. II*, 556 A.2d at 698. A hybrid contract

involving both sale and service elements is deemed a sale contract if its " 'predominant factor …, the thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved.' " *Miles Labs., Inc. v. Doe,* 315 Md. 704, 556 A.2d 1107, 1117 n. 10 (1989) (quoting *Burton v. Artery Co.,* 279 Md. 94, 367 A.2d 935, 943 (1977)). The predominant purpose of the transaction between Defendant and Mr. Casey was, in Plaintiffs' words, the provision "of service to consumers relating to computer repairs and maintenance." Compl. ¶ 35. The sale of the CD drive "was incidental to the services provided by" Defendant, not the primary purpose of the transaction. *See Rassa v. Rollins Protective Servs. Co.,* 30 F.Supp.2d 538, 542 (D.Md.1998) (applying the predominant purpose test). Rather than "a transaction of sale with labor incidentally involved," *Miles Labs., Inc.,* 556 A.2d at 1117, the transaction between Plaintiffs and Defendant is best characterized as a transaction of services with sale incidentally involved.

■■■ Accordingly, the implied warranty of fitness for a particular purpose is inapplicable in Plaintiffs' case. Moreover, even were this Court able to characterize the parties' transaction as sales-based, rather than service-based, such that the implied warranty might be viable, Maryland law requires that the buyer have a particular purpose for the goods, unique from the " 'normal use of the goods,' " and that the buyer have expressed that particular purpose to the seller in a way that informs the seller that the buyer is relying on the seller's skill or judgment. *Id.* at 97 (quoting *Ford Motor Co. v. Gen. Accident Ins. Co.,* 365 Md. 321, 779 A.2d 362, 375 (2001)); *see also Gricco v. Carver Boat Corp.,* No. JFM–04–1854, 2005 WL 3448038, at *2 (D.Md. Dec. 15, 2005) ("A particular purpose differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business." (citation and internal quotation marks omitted) (emphasis removed)). The record does not suggest that Mr. Casey had a "peculiar" or unique purpose for the computer (or the new CD drive), nor does it suggest that Mr. Casey expressed any such purpose to Defendant when he delivered the computer for servicing. For the reasons explained above, Plaintiffs are unable to establish a prima facie case for breach of any warranty—express or implied—under Maryland law, and no fact finder could reasonably find in their favor on such claims. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. Accordingly, "there is no genuine issue as to any material fact" and summary judgment in favor of Defendant as to Plaintiffs' breach of warranty claim is GRANTED. *See* Fed.R.Civ.P. 56(c).

■■■ In their Response to Defendant's Motion for Summary Judgment, perhaps in recognition of the flaws in their breach of warranty claims described above, Plaintiffs—for the first time—seek to re-characterize their breach of warranty claim as a breach of contract claim. *See* Pls.' S.J. Resp. 14 ("[Mr. Casey's] claim for 'Breach of Warranty of Fitness for Use' is better titled as a claim for Breach of Contract."). The Complaint contains no reference to a breach of contract cause of action. As Defendant correctly notes in its Reply, "Plaintiffs are essentially attempting to amend their Complaint, without leave of the Court and at this late stage of the proceedings." *Id.* While the Federal Rules of Civil Procedure establish a liberal pleading standard, they do " 'not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.' " *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 455 F.Supp.2d 399, 436 (D.Md.2006) (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314–15 (11th Cir.2004)). Indeed, the Fourth Cir-

cuit has held that "a plaintiff may not raise new claims after discovery has begun without amending his complaint." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir.2009); *see United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contr. Co.*, 612 F.3d 724, 731 (4th Cir.2010); *Smith v. Vilsack*, No. DKC–10–2306, 2011 WL 2181514, at *5 (D.Md. June 2, 2011). Rule 1 encourages the Court "not [to] exalt form over substance," *Monge v. Portofino Ristorante*, 751 F.Supp.2d 789, 792 n. 1 (D.Md.2010), but it also requires the Court to construe the rules of procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed.R.Civ.P. 1. To permit Plaintiffs to raise their new breach of contract claim in response to Defendant's Motion for Summary Judgment "would subject [Defendant] to unfair surprise" in the form of a previously unannounced cause of action, *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir.2005), and would be contrary to the admirable aims of Rule 1.

Consequently, Plaintiffs should have raised their new breach of contract claim in a motion to amend the complaint pursuant to Fed.R.Civ.P. 15(a), and not in their response to Defendant's Motion for Summary Judgment. Despite ample opportunity to do so, Plaintiffs have not sought leave to amend their Complaint to include this claim, and—until Plaintiffs' filing this Response—Defendants were without notice of Plaintiffs' breach of contract claim. Therefore, a breach of contract claim is not properly before this Court and will not be considered here.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion *In Limine* to Exclude the Testimony of Dr. Clark Riley is GRANT-ED. Defendant's Motion for Summary Judgment also is GRANTED.